UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

    Plaintiff,

 vs.        REPORT AND RECOMMENDATION

Erik Lee Rekonen (1),
John Francis Hasty (2),
Derek Joseph Carlson (4),
and Darren Charles
Roivanen (5),

    Defendants.   Crim.  07-0123 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


I.  Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C.  §636(b)(1)(B), upon the following Motions of the Defendants Erik Lee

Rekonen ("Rekonen"), John Francis Hasty ("Hasty"), Derek Joseph Carlson

("Carlson"), and Darren Charles Roivanen ("Roivanen"):

  1. The Motions of Rekonen, Hasty, and Roivanen, to
    Suppress Evidence from Search.

2. The Motions of Hasty, Carlson, and Roivanen, to Suppress Statements.

A Hearing on the Motions was conducted on July 12, 2007,[1] at which time, Rekonen appeared personally, and by John S. Lind, Esq.;[2] Hasty appeared personally, and by Andrea K. George, Assistant Federal Defender; Carlson appeared personally, and by John S. Hughes, Esq.; Roivanen appeared personally, and by Douglas B. Altman, Esq.; and the Government appeared by Thomas M. Hollenhorst, Assistant United States Attorney.[3]

For reasons which follow, we recommend that Roivanen's Motion to Suppress Evidence from Searches and Seizures be denied; that the Motions of Rekonen, and

---

[1] At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motions. Leave was granted, and the last submission on the issues was received on August 1, 2007, at which time, the Motions were taken under advisement. See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

[2] Rekonen's counsel of Record -- Craig E. Cascarano, Esq. -- had a conflict in his schedule which precluded his attendance at the Hearing in this matter and, with the consent of Rekonen, John S. Lind, Esq., substituted as his counsel at the time of his Arraignment, and at the Motions Hearing, which were conducted on the same date.

[3] The Government's counsel of Record -- Andrew R. Winter, Assistant United States Attorney -- also had a scheduling conflict, and Thomas M. Hollenhorst, Assistant United States Attorney, substituted on behalf of the Government at the time of the Hearing.

- 2 -

Hasty, to Suppress Search and Seizure Evidence be denied; and that the Motions of Hasty, Carlson, and Roivanen, to Suppress Statements be denied.

## II. Factual and Procedural Background

Rekonen, Hasty, Carlson, and Roivanen, are each charged with one (1) Count of conspiracy to distribute, and possess with intent to distribute, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of Title 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 846. Hasty is also charged with one (1) Count of possessing a firearm by a felon, in violation of Title 18 U.S.C. §§922(g)(1), and 924(a)(2). The events which gave rise to those charges are alleged to have taken place in or about 2004, through on or about February 1, 2007, in this State and District.

At the Hearing, the Government introduced two (2) Search Warrants, with accompanying Affidavits, that authorized searches of the residences, vehicles, and persons, of Hasty and Rekonen, and it presented the testimony of Elizabeth Ann Flanagan ("Flanagan"), Sean E. Harris ("Harris"), and Timothy Lee Officer ("Officer"), who are Deputies with the St. Louis County Sheriff's Office. In addition,

Carlson testified on his own behalf.  As pertinent to those charges, and to the Motions now before us, the operative facts may be briefly summarized.[4]

At the Hearing, Flanagan testified that, on February 12, 2007, she went to Carlson's residence with Tim Mellor ("Mellor"), and Ronald Walker ("Walker") (collectively, the "Agents"), who are Special Agents employed by the Drug Enforcement Administration ("DEA"), and that she left information asking Carlson to contact them, in connection with an ongoing narcotics investigation.  According to Flanagan, the Agents told her that Carlson subsequently made telephone contact with one of them, and set up a lunch time meeting for February 14, 2007, at a Perkins restaurant in Superior, Wisconsin.  Flanagan testified that she and the Agents arrived at the restaurant prior to Carlson, and were wearing plainclothes, and carrying concealed weapons, which were not displayed during the meeting.  When Carlson

---

[4]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006).  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

arrived at the restaurant, Flanagan and the Agents introduced themselves, and disclosed their law enforcement affiliation, and then they were seated in a booth, with Carlson in the outside position, so that he could leave without disturbing anyone. According to Flanagan, the restaurant was fairly busy during the meeting.

Flanagan testified that the meeting began when the Agents clarified that Carlson was not under arrest, and was free to leave at any time.  Carlson stated that he had spoken with an attorney and, when Flanagan told him that he could have an attorney present with him at the meeting, Carlson stated that he understood that, but he did not ask for an attorney.  When Carlson produced a recording device, and stated that his attorney had instructed him to record the meeting, Walker told him that he was not under arrest, and would not be permitted to tape record their conversation.  According to Flanagan, Carlson agreed not to record the meeting.

Flanagan testified that the meeting lasted approximately thirty (30) to forty-five (45) minutes.  After the group had ordered their food, the Agents described the purpose of their meeting, which was to discuss an ongoing drug investigation. Carlson was asked if he knew Rekonen, Hasty, and Roivanen, and he stated that he did, and that he knew that Hasty had obtained drugs from Rekonen, which Hasty then sold, and that Rekonen carried a weapon, and had asked Carlson to collect drug debts.

Flanagan testified that, as the conversation progressed, Carlson began to ask more questions, and eventually asked to speak with his attorney.  According to Flanagan, as soon as Carlson asked for his attorney, the officers stopped questioning him, and Carlson paid his check and left the restaurant.  Flanagan noted that Carlson asked at least one question, after he asked for his attorney, and Walker replied that they could not continue their conversation since Carlson had invoked his right to counsel. Flanagan characterized the tone of the lunch meeting as casual, and stated that Carlson was free to leave at any time, and was not threatened, that the parties did not discuss what would happen to Carlson, and that Carlson was not arrested at the end of the meeting.

Flanagan denied telling Carlson that he would not be subject to a Subpoena to appear before the Grand Jury -- if he cooperated in the ongoing investigation -- and she stated that she did not hear either of the Agents make such a statement to Carlson. Instead, she testified that she, and the Agents, had contacted one of Carlson's friends and, through that friend, had confirmed Carlson's work address, and had determined that it was a location where he could be served with a Subpoena.  Flanagan added that she was not certain when, or where, Carlson was served with the Grand Jury Subpoena.

- 6 -

At the Hearing, Carlson testified on his own behalf, and stated that he felt that Flanagan's testimony had been accurate, although the Subpoena for the Grand Jury had been present on the table throughout the meeting at the Perkins restaurant, and likewise, had been mentioned on the telephone, in his earlier phone conversation with the Agents.  Carlson added that, prior to the lunch meeting, he had heard from some of his friends that the Agents were looking for him in order to serve the Subpoena, and that he would be served at work if he did not contact them.  According to Carlson, Mellor stated that, if Carlson cooperated, he would not have to be subpoenaed, and Carlson arranged for the meeting with the Agents because he wanted to avoid being served at work.

Carlson affirmed that he had met with an attorney prior to the meeting, who had advised him to bring a tape recorder, and that, after he was told by the Agents that the meeting would not take place if he taped it, he voluntarily shut the tape recorder off. According to Carlson, the Agents told him that they wanted a list of people, places, and money, which were related to their drug investigation, and he replied that he did not know anything.  At that time, the Agents told him that they believed that he had been an accountant for the drug operation, and showed him the Subpoena, and he ended the conversation, paid his check, and left the restaurant.  Carlson added that the

meeting was not intimidating, that he felt free to go, he was not arrested at the end of

the meeting, and that he had no fear that he would be arrested if he did not cooperate,

but that he felt intimidated by the idea of being served with the Subpoena.  According

to Carlson, he was told by the Agents that, if he did not agree to meet on February 14,

2007, then he would be subpoenaed to appear before the Grand Jury.

　　　At the Hearing, the Government also introduced testimony regarding a traffic

stop of Roivanen, that occurred on October 6, 2006.[5]  Harris testified that he had been

on patrol, around midnight on October 6, 2006, when he observed a blue Ford pickup

truck, with an obstructed view, and no light on the rear license plate, which were

violations of Minnesota law.  According to Harris, he had seen the vehicle earlier in

the evening leaving a known drug house -- although that fact was not recorded in his

official report -- and additionally, that he had observed it parked on the side of the

road behind another vehicle.  Harris testified that he turned on his lights when he

---

　　　[5]In his Motion to Suppress, see, <u>Docket No. 118</u>, Roivanen also challenged the admissibility of evidence obtained as a result of a second traffic stop, that took place on April 28, 2007.  At the Hearing, the Government advised that it would present no evidence, in its case in chief, about any matters relating to the traffic stop of April 28, 2007, and therefore, we recommend that, to the extent that Roivanen seeks the suppression of evidence from that traffic stop, his Motion be denied as moot.

decided to stop the vehicle, and the driver, who he later identified as Roivanen, pulled to the side of the road.

As Harris approached the truck, Roivanen put his head and full arm out of the driver's side window to look back at him, and Harris testified that he had never observed such behavior during a traffic stop, and that it seemed suspicious to him. Harris asked Roivanen for his driver's license and insurance information and, while Roivanen looked in the vehicle for those documents, Harris turned the beam of his flashlight into the interior of the vehicle, which caused Roivanen to protest that Harris was not allowed to look into his vehicle. Harris observed that Roivanen's eyes were bloodshot, watery, and glassy, but he did not smell alcohol, although he testified that he believed that Roivanen was under the influence of drugs.[6]

---

[6]At the Hearing, counsel for Roivanen asked the Court to examine Roivanen's eyes, and to take judicial notice of the fact that, although he was in the custody of the United States Marshal Service, and presumably had consumed no intoxicants before his Court appearance, his eyes were still bloodshot and watery. We examined Roivanen's eyes, and found that they were red at the periphery, and did not appear to be abnormally watery. However, as we noted at the Hearing, we have never evaluated an individual, and claim no expertise, so as to determine whether an individual was under the influence of drugs or alcohol. Moreover, we would have no way to compare the conditions of Roivanen's eyes in comparison to their appearance on the date of the traffic stop. Notably, Harris was not asked to opine on such a comparison.

Harris asked Roivanen to step out of his vehicle in order that he could perform field sobriety tests, so as to determine whether Roivanen was able to drive his vehicle from the scene.  Harris testified that he first asked Roivanen to perform a horizontal gaze test, and that, although he did not observe any indicators of intoxication, such as involuntary jerking, he knew that small amounts of stimulant drugs, such as methamphetamine, might not cause such indicators.  Next, Harris asked Roivanen to perform a walk and turn test, and Harris observed that Roivanen performed the test poorly, as he began before Harris had completed his explanation, made no heel/toe contact, used his arms for balance, stepped off the imaginary line, made an improper number of steps, did not count his steps out loud, and did not watch his feet.  Harris also asked Roivanen to perform a one-leg stand test, which he also performed poorly, and again, he began the test before Harris had completed his explanation.

Harris testified that he asked Roivanen to wait in the back of his squad car while he called Trooper Brian Kerry ("Kerry"), of the Minnesota State Highway Patrol, to the scene in order to perform additional field tests.  Harris did not handcuff Roivanen, or place him under arrest, and Harris testified that, if Roivanen had declined to wait in his squad car, he would have asked him to sit on the curb until Kerry arrived, but would not have allowed him to operate his vehicle, and leave the

scene.  Kerry arrived five (5) to ten (10) minutes after he received the call from Harris, and performed additional field sobriety tests on Roivanen.  Harris testified that he did not observe Roivanen perform those additional tests, but stated that Kerry later informed him that Roivanen again performed poorly, and Kerry agreed with Harris' conclusion that Roivanen was under the influence of drugs.

During the course of Kerry's field sobriety tests, Roivanen admitted to Kerry that he had smoked marijuana earlier in the evening, and continued to feel its effects, and that he had consumed hallucinogenic mushrooms the previous night.  Kerry put Roivanen in the back of Harris' squad car, and reported his findings to Harris.  Harris made the determination to arrest Roivanen for driving while intoxicated, at 12:55 o'clock a.m., approximately forty-five (45) minutes after the initial traffic stop.  Harris then called for a canine sniff of Roivanen's vehicle.

As we have noted, Officer, who is a Deputy with the St. Louis County Sheriff's Department, was the third witness to testify at the Hearing, and again, at the behest of the Government.  Officer stated that he was a dog handler, who worked with Rico, which is a German Shepherd that has been trained to sniff for marijuana, cocaine, heroine, and methamphetamine, and to signal the presence of those drugs by

scratching with one (1), or both of his front paws, at the location where he smelled the drugs.

Officer testified that he and Rico were called to the scene of the traffic stop described by Harris, in order to perform a drug sniff of Roivanen's vehicle.  Officer stated that he began the sniff with Rico at the driver's side front headlight, and worked clockwise around the vehicle, until Rico reached the driver's side door, at which time, Rico alerted to the presence of drugs by scratching.  Officer then opened the door, and Rico entered the cab of the truck, but he did not signal again.  Officer then allowed Rico to go behind the front seat into the extended cab section of the vehicle, and Rico gave an indication that drugs were present by putting his nose on a black nylon bag, and pushing down.  Officer removed that bag, searched it, and found that it contained a quantity of a white substance that he believed was methamphetamine.  According to Officer, the dog sniff lasted approximately twenty (20) minutes.

Officer also testified that the St. Louis County Sheriff's Department maintains an inventory search policy, that requires vehicles to be searched prior to impounding, and that such searches generally take place prior to towing.

III.  Discussion

A.    The Motions of Rekonen, Hasty, and Roivanen, to Suppress Evidence
      Obtained as a Result of Search and Seizure.

The Defendants Rekonen, Hasty, and Roivanen, have each moved to suppress

evidence that was obtained as a result of search and seizure.  Rekonen argues that a

search of his residence, which was conducted pursuant to a Search Warrant, was

unlawful because that Warrant was stale, and lacked probable cause, while Hasty

challenges a search of his residence, and vehicle, based upon the "four corners of a

Search Warrant" that was issued in the matter.  Roivanen has moved to suppress

evidence that was obtained as a result of a search of his vehicle, and person, following

the traffic stop of October 6, 2006, as he argues that law enforcement lacked probable

cause for his arrest.

1.    The Motions of Rekonen, and Hasty, to Suppress Evidence
      Obtained Pursuant to a Search Warrant.

a.    Standard of Review.  In the issuance of a Search Warrant, the

Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer,

will assess the underlying factual circumstances so as to ascertain whether probable

cause exists to conduct a search, or to seize incriminating evidence, the

instrumentalities or fruits of a crime, or contraband.  See, Warden v. Hayden, 387 U.S.

- 13 -

294 (1967); United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007)("A search warrant may only be issued upon a showing of probable cause that evidence or instrumentalities of a crime or contraband will be found in the place to be searched."), citing Walden v. Carmack, 156 F.3d 861, 870 (8th Cir.1998); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996).

In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place. See, Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Davis, 471 F.3d 938, 945 (8th Cir. 2006); United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, supra at 232; see also, Ornelas v. United States, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'"  United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodson, 165 F.3d 610, 613

(8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999).   In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis.  See, Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002); United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991).  Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant.  See, United States v. Durham, 470 F.3d 727, 733 (8th Cir. 2006); United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).  This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants. See, Illinois v. Gates, supra at 236.

Moreover, "[i]t is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005); see, United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir. 1995). Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in executing a Search Warrant, "may make probable

cause fatally stale." United States v. Maxim, supra at 397 [quotations omitted]. "There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry. Id., quoting United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993); see, United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002); United States v. Rugh, 968 F.2d 750, 754 (8th Cir. 1992); United States v. Kennedy, supra at 1141. As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." United States v. Rugh, supra at 754.

Therefore, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." United States v. Maxim, supra at 397, quoting United States v. Koelling, supra at 822. Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'" United

States v. Ozar, supra at 1446, quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

      b.    Legal Analysis.  Since the Motions to Suppress involve different factual predicates, we examine them separately.

      1)    Hasty's Motion to Suppress.  Hasty argues that his residence, and vehicle, were searched pursuant to a Warrant that was issued without probable cause.  See, Hasty's Motion to Suppress Evidence, Docket No. 79, at p. 1. No testimony was adduced at the Hearing on the Defendant's Motion, and therefore, consistent with the Defendant's challenge to the Warrant, we limit our consideration of the Motion to the "four corners" of the Search Warrant, as well as the Application for Search Warrant, and the Supporting Affidavit.

      The challenged Search Warrant was issued by a Minnesota District Court Judge on January 22, 2007, and authorized a search of Hasty's residence, which is located in Mt. Iron, Minnesota, of a vehicle that was registered to Hasty, and of Hasty's person.  Specifically, the Search Warrant authorized a search and seizure of any controlled substances, including, but not limited to, marijuana and methamphetamine, any materials or computer lists associated with the use or distribution of marijuana or methamphetamine, documents that would show ownership or occupancy of the

- 17 -

premises to be searched, cellular telephones and any telephone records or answering machines, United States currency, and any firearms and ammunition.  See, <u>Search Warrant</u>, <u>Government Exhibit 2</u>, at p. 1.[7]

Attached to the Search Warrant was an Application, and Affidavit, that were executed by Stephen Borchers ("Borchers"), who avers that he is a Deputy with the St. Louis County Sheriff's Department, and has over seventeen (17) years of law enforcement experience, which includes training in narcotics investigation, as well as in the identification, packing, and consumption of controlled substances, and further detailing that he has testified as an expert witness relating to the sale and consumption of controlled substances.  In addition, Borchers has participated in numerous street level investigations, which have led to the criminal conviction of numerous individuals for controlled substances violations.

---

[7]At the Hearing, the Government submitted a copy of the Application for a Search Warrant, the Search Warrant, and the Inventory List, as Government Exhibit 2, and acknowledged that the copy of that Search Warrant had not been signed.  With Court leave, and no objection from Hasty, on July 23, 2007, the Government submitted a signed copy of the original Search Warrant, and based on the Government's representation, we accept that Warrant as an authentic copy and, in any event, with the exception of the signatures on the newly submitted document, the remainder is identical to Government Exhibit 2.

In his Affidavit, Borchers averred that, on or about November 20, 2006, he was contacted by a Confidential Reliable Informant ("CRI-1"), who allegedly owed Hasty approximately $1,000.00 from a drug debt. Borchers knew Hasty from a previous drug investigation, and was aware that he lived in Mt. Iron. Borchers and Flanagan met, and searched, CRI-1 so as to determine that no contraband was present. Borchers and Flanagan then gave CRI-1 $500.00, in pre-recorded money from the Boundary Waters Drug Task Force ("BWDTF"), in order to pay off the drug debt owed to Hasty, with the understanding that Hasty would then provide CRI-1 with an amount of methamphetamine to sell in order to repay the remaining $500.00 drug debt. CRI-1 was fitted with a recording device, and he or she then called Hasty, and asked to meet at a Subway restaurant in Eveleth, Minnesota. Borchers attested that, at 1:40 o'clock p.m., he saw Hasty driving a 2001 Ford Ranger with a female passenger, that was backing into a parking space in the Subway parking lot, next to the vehicle of CRI-1, so that he was window-to-window with CRI-1. Hasty rolled down his window, stuck out his hand, and told CRI-1 to put the money in his hand, and CRI-1 gave him $500.00. CRI-1 then asked Hasty if he had anything to exchange, and Hasty told CRI-1 that he did not have anything, but that he would contact CRI-1 by the end of the day, and Hasty then drove away.

According to Borchers, on December 18, 2006, Deputy Bellville ("Bellville") of the St. Louis County Sheriff's Department saw Hasty, and another individual, enter a vacant residence in Mt. Iron that had a "for sale" sign in the front.  Bellville, and another deputy, contacted Hasty's companion, who told them that Hasty was trying to buy that house.  The owner of that house later confirmed that Hasty was a potential buyer of the house.

On December 19, 2006, Flanagan and Borchers contacted CRI-1, and met at an undisclosed location to discuss current drug activity.  CRI-1 told the officers that Hasty was looking for a house to purchase, and was currently staying at a hotel in Virginia, Minnesota.  CRI-1 added that, within the past five (5) days, Hasty had supplied CRI-1 with several firearms, which were to be delivered to an individual in Duluth and, for that job, Hasty paid CRI-1 with ⅛ ounce of methamphetamine.  CRI-1 added that this agreement with Hasty had resulted in CRI-1 transporting firearms, for Hasty, approximately five (5) times in the past year.

On December 20, 2006, Flanagan and Borchers contacted a second Confidential Reliable Informant ("CRI-2"), who allegedly had a drug debt with Hasty in the amount of $250.00, and who told the law enforcement officers that Hasty would usually "front" approximately ½ ounce to 1 ounce of methamphetamine without

payment.   CRI-2 advised the officers that, within the following twenty-four (24) hours, Hasty would provide CRI-2 with more methamphetamine if the standing drug debt was repaid.

On January 5, 2007, Flanagan met with CRI-2, who placed a recorded telephone call to Hasty, in which Hasty agreed to meet CRI-2 in the parking lot of a Target store. Flanagan determined that the vehicle and person of CRI-2 were devoid of contraband, and CRI-2 produced $260.00 that Flanagan counted and returned.  At 6:03 o'clock p.m., Flanagan observed Hasty's vehicle pull up next to the vehicle of CRI-2 in the Target parking lot.  Hasty left his car running, got into the passenger side of CR2's vehicle and, at 6:04 o'clock p.m., Hasty returned to his vehicle and drove out of the parking lot.  CRI-2 then met with the officers and produced ½ ounce of a substance that was subsequently confirmed to be methamphetamine.

On January 16, 2007, at 4:00 o'clock p.m., Borchers received a call from CRI-2, who reported that Hasty had methamphetamine available for purchase and, at 5:40 o'clock p.m., Borchers, Flanagan, two (2) other officers from the BWDTF, and an officer from the Virginia Police Department, met and searched CRI-2 so as to insure that no contraband was present.  CRI-2 was then given $950.00 in pre-recorded BWDTF money to purchase ½ ounce of methamphetamine from Hasty, and was fitted

with a recording device.  At 6:55 o'clock p.m., Hasty pulled into the parking lot in the space next to CRI-2's vehicle, and tossed an object from his window into CR2's vehicle, and shortly thereafter, CRI-2 tossed an object into Hasty's vehicle.  Hasty then drove away, and was followed to a location in Virginia, Minnesota.  Law enforcement officials then met with CRI-2, who produced ½ ounce of a substance that was later tested, and was confirmed to be methamphetamine.

On January 18, 2007, a Deputy Yarick of the St. Louis County Sheriff's Department contacted Borchers, and stated that she had in her possession a utility receipt in Hasty's name, from the house in Mt. Iron that he had previously been seeking to purchase, and additionally, had a Change/Adjustments form from the City of Mt. Iron, which was dated December 26, 2006, and which identified Hasty as the renter of that house.

The challenged Search Warrant was issued on January 22, 2007, and was executed on the same day at 1:00 o'clock p.m.  The Receipt associated with the Search Warrant recorded that the law enforcement officials, who conducted the search of Hasty's residence, and vehicle, confiscated various drug paraphernalia, weapons, and ammunition, as well as several video cameras, cell phones and other electronics, and

paperwork relating to the utilities for the residence.  See, <u>Receipt</u>, <u>Government Exhibit</u> <u>2</u>.

On this showing, we find that there was adequate probable cause to support the issuance of the Search Warrant for Hasty's residence, vehicle, and person.  We recognize that much of the information, which is contained in the Affidavit, was supplied by the two (2) CRIs and, when probable cause for a Search Warrant is based on information provided by an informant, the core question "'is whether the information is reliable.'"  <u>United States v. Warford</u>, 439 F.3d 836, 841 (8th Cir. 2006), quoting <u>United States v. Williams</u>, 10 F.3d 590, 593 (8th Cir. 1993); <u>United States v.</u> <u>Koons</u>, 300 F.3d 985, 993 (8th Cir. 2002); see also, <u>United States v. Reivich</u>, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").  As our Court of Appeals has stated:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations:  a deficiency in one may be compensated for, in determining the overall reliability of a

> tip, by a strong showing as to the other, or by some other
> indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at
> 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995), cert. denied, 513 U.S. 888 (1994).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'"  Id., citing United States v. Anderson, supra at 615.

As a consequence, the "core question" is whether the information, which was provided by the informant, was reliable.  See, United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable.").  In this respect, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause."  United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998), cert. denied, 525 U.S. 919 (1998).  In turn, an informant is deemed reliable when his statements are corroborated by independent evidence.  See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003)("[C]orroboration of minor, innocent details may support finding of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also, United States v. Koons, supra at 993 ("'Information may be sufficiently reliable to support a probable cause finding if the

person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.'"), quoting United States v. Fulgham, supra at 401; United States v. Formaro, 152 F.3d 768, 770 (8th Cir. 1998)("[C]orroboration of the confidential informant's information by independent investigation is an important factor in the calculus of probable cause.").

Here, the CRIs were known to law enforcement. See, United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005), quoting Florida v. J.L., 529 U.S. 266, 270 (2000)("[A] known informant * * * can be held responsible if her allegations turn out to be fabricated."). Moreover, the information provided by the CRIs was confirmed by the controlled purchases of drugs from Hasty, which took place under monitoring that was conducted by Borchers, and the other law enforcement officials. See, United States v. Rivera, 410 F.3d 998, 1002 (8th Cir. 2005)(informant's credibility was established where his representations were corroborated by officer surveillance and the recovery of narcotics from the informant following a controlled drug transaction). Accordingly, we find that Borchers reasonably relied upon the information that was provided by CRI-1 and CRI-2.

We further find that the information, which was contained in the Search Warrant, and concerned the events of the preceding months that culminated in Hasty's

arrest, had not become impermissibly stale by the time that the Search Warrant was issued and executed.  Not only did the information, which was provided by CRI-1, relate to an ongoing narcotics investigation, but it had been "freshened" with more current information by CRI-2, who engaged in a controlled buy of a substance, that proved to be methamphetamine, on January 16, 2007, which was six (6) days prior to the issuance of the Warrant.  See, United States v. Ozar, supra at 1446 ("'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting United States v. Macklin, supra at 1326; see also, United States v. Morrow, 90 Fed.Appx. 183, 184 (8th Cir. 2004)("The seven-day delay did not render stale the information on which the Warrant was based."), citing United States v. Gibson, 123 F.3d 1121, 1124-25 (8th Cir. 1997)(four-day delay did not render the Warrant stale where drug activity was ongoing).  Nor can it be responsibly argued that a sufficient nexus, between illicit drugs, and Hasty's residence, had not been shown, given the statement of Deputy Yarick, on January 18, 2007, that she had, in her possession, a utility receipt for the residence in Mt. Iron that was in Hasty's name, and also held a Changes/Adjustments form that listed Hasty as the renter of that residence as of December 26, 2006.

Lastly, Hasty has not drawn our attention to any other constitutional defect in the Search Warrant, nor does our independent review disclose any. Therefore, having found that the Search Warrant was supported by sufficient probable cause, and was not impermissibly stale, we recommend that Hasty's Motion to Suppress the evidence obtained pursuant to the Search Warrant be denied.[8]

 2)   <u>Rekonen's Motion to Suppress</u>.  Rekonen also challenges the admissibility of the evidence, that was obtained pursuant to a Search Warrant which was issued by a Minnesota District Court Judge on January 22, 2007.[9]  See,

---

[8]Even if the information in the Search Warrant were insufficient to establish probable cause, or were impermissibly stale, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because the Warrant was "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon." <u>United States v. McNeil</u>, 184 F.3d 770, 775 (8th Cir. 1999), citing <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984). Accordingly, even if probable cause were lacking, we would still recommend that Hasty's Motion to Suppress Evidence Obtained from Search Warrant be denied.

[9]We note that Rekonen has filed a Motion to Suppress Evidence Obtained through Illegal Search, see, <u>Docket No. 55</u>, and a Motion to Suppress Search and Seizure Evidence.  See, <u>Docket No. 57</u>.  After reviewing those Motions, as well as Rekonen's Memorandum in Support of the Motions, we find that the Motions seek the same relief; namely, the suppression of evidence that was recovered as a result of a search of his residence pursuant to a Search Warrant.  Rekonen has not alleged that any other search of his residence, vehicle, or person, took place, which would give rise to a constitutional violation.  Therefore, we address his claims solely as they relate to the validity of the search that was conducted, pursuant to the Search Warrant that was

(continued...)

Search Warrant, Government's Exhibit 1, at p. 1.  The Warrant authorized a search of Rekonen's residence, which is located in Virginia, Minnesota, of a vehicle registered to Vicki Marie Rekonen ("V. Rekonen"), and of Rekonen's person.  Specifically, the Search Warrant authorized a search and seizure of any controlled substances, including, but not limited to, marijuana, cocaine and methamphetamine, any materials or computer lists associated with the use or distribution of marijuana, cocaine or methamphetamine, documents that would show ownership or occupancy of the premises to be searched, cellular telephones and any telephone records or answering machines, United States currency, and any firearms and ammunition.  Id.

Attached to the Search Warrant was an Application, and Affidavit, that were executed by Flanagan, who avers that she has training in narcotics investigation, and in the identification, packing, and consumption of controlled substances, and has participated in numerous street level investigations, which have led to the criminal conviction of numerous individuals for drug trafficking violations.

In the Affidavit, Flanagan attested that, on or about December 11, 2006, she spoke to an officer with the Minneapolis Police Department, who stated that he had

---

[9](...continued)
issued on January 22, 2007.

contact with a CRI ("CRI-3"), who could purchase methamphetamine from Rekonen. Flanagan had prior knowledge of Rekonen being involved in numerous drug transactions in Virginia, and Duluth, and the BWDTF had an open investigation relating to Rekonen for methamphetamine distribution. Flanagan was also aware that Rekonen was on electronic home monitoring, as part of his being on supervised release parole with Arrowhead Regional Corrections, and that he was living with his mother, V. Rekonen, in Virginia.

On December 13, 2006, at 4:10 o'clock p.m., Flanagan met and searched CRI-3 so as to confirm that no contraband was present. Flanagan then gave CRI-3 $1,700.00, in pre-recorded BWDTF money, with which to purchase methamphetamine from Rekonen. CRI-3 contacted Rekonen, who instructed CRI-3 to drive to Rekonen's residence, and park down the street. CRI-3, and an undercover officer, drove to Rekonen's residence, and CRI-3 left the vehicle, and walked down the alleyway to Rekonen's house. When CRI-3 entered the house, Rekonen stated that he did not have any methamphetamine at the house, and he instructed CRI -3 to drive around for ten (10) minutes, until someone contacted CRI-3 to meet for the drug transaction.

CRI-3 joined the undercover officer in the vehicle, and they drove until CRI-3 received a telephone call telling them to meet in the Electronics Department, at the K-Mart store in Virginia.  CRI-3 met with the Defendant Clayton John Celley ("Celley") in the K-Mart, and handed him $1,700.00 in exchange for approximately one (1) ounce of what proved to be methamphetamine.

On December 18, 2006, Flanagan again spoke to a Minneapolis police officer, who confirmed that CRI-3 would be able to purchase two (2) ounces of methamphetamine from Rekonen.  On December 20, 2006, Flanagan met and searched CRI-3, in order to assure that no contraband was present, and gave CRI-3 $3,200.00 in money, that was obtained from the DEA, to purchase methamphetamine from Rekonen.  By telephone, Rekonen instructed CRI-3 to go to his residence and, after CRI-3 and an undercover officer arrived at Rekonen's residence, CRI-3 called Rekonen, who told CRI-3 to meet him in his garage.  In the garage, CRI-3 handed Rekonen the $3,200.00, and Rekonen handed CRI-3 two (2) ounces of a substance that subsequently tested positive for methamphetamine.

On the date of her Application and Affidavit, which was January 22, 2007, Flanagan attested that, within the past five (5) days, she had been present when CRI-3 called Rekonen, and Rekonen confirmed plans to sell approximately ½ pound of

- 30 -

methamphetamine to an undercover officer.  At that time, CRI-3 confirmed seeing

Rekonen, within the past twenty-four (24) hours, carrying a semi-automatic pistol and

five (5) loaded magazines on his person.

The challenged Search Warrant was issued on January 22, 2007, and was

executed on the same day at 12:28 o'clock p.m.  The Receipt associated with the

Search Warrant recorded that the law enforcement officials, who conducted the search

of Rekonen's residence, confiscated large quantities of cash, a notebook and a laptop

computer, methamphetamine and pills, as well as home electronics and papers that

were addressed to Rekonen.  See, Receipt, Government Exhibit 1.

On the Record before us, we find that there was adequate probable cause to

support the issuance of the Search Warrant for Rekonen's residence, vehicle, and

person.  As we addressed, in our discussion of Hasty's Motion to Suppress, an

Affidavit supported by information supplied by a CRI supplies probable cause as long

as that information is reasonably determined to be reliable, which requires

corroboration by independent evidence.  See, United States v. Warford, supra at 841;

United States v. Koons, supra at 993; United States v. Wright, supra at 975; United

States v. Carpenter, supra at 669.  Here, Rekonen does not challenge the reliability of

CRI-3, and we find nothing in the Record that would suggest that the informant was

not reliable, as the information provided by CRI-3 was confirmed by the controlled purchases of drugs from Rekonen on two (2) occasions.

In his Memorandum in Support, see, <u>Docket No. 127</u>, Rekonen alleges that the information in the Affidavit had become impermissibly stale by the time that the Warrant was issued, and he notes that the information, in the Affidavit, relates to two (2) controlled buys that took place on December 13, 2006, and December 20, 2006, which was over a month before the issuance of the Warrant on January 22, 2007. Rekonen further argues that, although, in her Affidavit, Flanagan mentions being with CRI-3 five (5) days earlier, and arranging for an undercover officer to purchase one-half (½) pound of methamphetamine from Rekonen, and further, that CRI-3 had observed Rekonen in the possession of weapons within twenty-four (24) hours of the date of the Affidavit, those allegations do not serve to refresh the events previously alleged in the Affidavit, or provide a basis for probable cause to search his residence, as CRI-3 made no claim that Rekonen kept either the methamphetamine, or the weapons, at his residence, and Rekonen told CRI-3, at the time of the controlled buy on December 13, 2006, that he did not have drugs in his home.

Our Court of Appeals has held that "[t]he passage of time between the transactions on which a warrant is based and the ensuing search is less significant

when the facts recited indicate activity of a continuous nature." United States v. Jones, 801 F.2d 304, 314 (8th Cir. 1986); see also, United States v. Rugh, supra at 750; United States v. Comeaux, 955 F.2d 568 (8th Cir. 1992), cert. denied, 506 U.S. 845 (1992). "In investigations of ongoing narcotics operations, 'intervals of weeks or months between the last described act and the application for a search warrant [does] not necessarily make the information stale.'" United States v. Smith, 266 F.3d 902, 905 (8th Cir. 2001), quoting United States v. Formaro, 152 F.3d 768, 771 (8th Cir. 1998)[omitting quoted case]; see also, United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)(concluding that a drug transaction one month prior to the Warrant application was not stale information in light of the ongoing nature of the crime); United States v. Koelling, supra at 822 ("[T]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.").

Flanagan attested that she believed that Rekonen was actively involved in the distribution of controlled substances, and included allegations, in the Application, that Rekonen was involved in controlled buys of methamphetamine in the month prior to the issuance of the Search Warrant. We find that the Affidavit sufficiently alleges that

Rekonen was a participant in a continuous drug trafficking activity so as to allow the

District Court Judge to find probable cause to issue the Warrant.

Moreover, although Rekonen argues that there is no allegation in Flanagan's

Affidavit, that Rekonen was storing controlled substances at his residence, Flanagan's

Affidavit included the statement that she believed that a search of his residence

"would result in the discovery of this controlled substance distribution," and such

statements would allow a Judge to infer probable cause to search Rekonen's home

even when there is no direct evidence of narcotics in the home.  See, United States v.

Caswell, 436 F.3d 894, 898-99 (8th Cir. 2006)(finding that in the case of drug dealers

Magistrate Judges can infer that "evidence is likely to be found where the dealers

live.").[10]  In addition, Flanagan attested that CRI-3 had participated in a controlled buy

in the garage of Rekonen's house, on December 20, 2006, which was slightly over one

---

[10]As our Court of Appeals observed, in United States v. Hulett, 22 F.3d 779, 780 (8th Cir. 1994), "[f]ew places are more convenient tha[n] one's residence for use in planning criminal activity and concealing fruit of a crime."  See also, United States v. Etheridge, 168 F.3d 495, 1998 WL 792467 at **1 (8th Cir., November 18, 1998) ("Since it is well known that drug traffickers routine keep packaging equipment, ledgers, and other incriminating items in their living quarters, the affidavit provided sufficient reason to believe that [the defendant's] residence would contain evidence of criminal activity."); United States v. Formaro, 152 F.3d 768, 770 n. 2 (8th Cir. 1998); United States v. Premises Known as 6040 Wentworth Ave. South Mpls., 1996 WL 260745 at * 4 (D. Minn. 1996), aff'd, 123 F.3d 685 (8th Cir. 1997); United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994).  The same may be said here.

(1) month prior to the date of the Affidavit.  On the basis of those allegations, it was reasonable for the Judge to find that probable cause existed for the search of Rekonen's house, as well as his vehicle and person.

Our independent review of the Search Warrant has not disclosed any other constitutional defect and, having found that the Search Warrant was supported by sufficient probable cause, and was not impermissibly stale, we recommend that Rekonen's Motion to Suppress the evidence obtained pursuant to the Search Warrant be denied.[11]

> 2. <u>Roivanen's Motion to Suppress Evidence Obtained Without A Warrant</u>.

Roivanen challenges the circumstances of his arrest, and has filed a Motion to Suppress the evidence obtained as a result of a warrantless search of his vehicle and person, following the traffic stop that occurred on October 6, 2006.

---

[11]As with Hasty's challenge to the Search Warrant of his residence, even if the information in the Search Warrant were insufficient to establish probable cause, or were impermissibly stale, we would find that the officer's good faith reliance upon the Search Warrant was reasonable, see, <u>United States v. McNeil</u>, 184 F.3d 770, 775 (8th Cir. 1999), and would still recommend that Rekonen's Motion to Suppress Evidence Obtained from Search Warrant be denied.

a.      Standard of Review.  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States Constitution, Amendment IV.  A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001), quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979); see also, United States v. Martinez-Fuerte, 428 U.S. 543, 556-558 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).

An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's privacy from arbitrary invasion by the Government.  See, Delaware v. Prouse, supra at 653-54; Marshall v. Barlow's Inc., 436 U.S. 307, 312 (1978); Camara v. Municipal Court, 387 U.S. 523, 528 (1967). Therefore, whether a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 654.

In considering the extent to which a traffic stop intrudes upon an individual's Fourth Amendment interests, the Supreme Court has held that traffic stops are

investigative detentions, not custodial detentions, and therefore, the principles of Terry v. Ohio, 392 U.S. 1 (1968), govern the analysis of the reasonableness of the stop.  See, United States v. Jones, supra at 925, citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); see also, Delaware v. Prouse, supra at 663.  As a consequence, the Supreme Court has instructed that, prior to making a traffic stop, a law enforcement officer must have "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations -- or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered."  Delaware v. Prouse, at 661.

"It is well established that a traffic violation -- however minor -- creates probable cause to stop the driver of a vehicle."  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004), quoting United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996), quoting, in turn, United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993). Accordingly, "a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver."  United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999), citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977).

"This is true even if a valid traffic stop is a pretext for other investigation."

United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002), citing Whren v. United

States, 517 U.S. 806, 812-13 (1996).  Simply put, "an arresting officer's state of mind

(except for the facts that he knows) is irrelevant to the existence of probable cause *

* * * [t]hat is to say, his subjective reason for making the arrest need not be the

criminal offense as to which the known facts provide probable cause."  Devenpeck v.

Alford, 543 U.S. 146, 153 (2004).  As the Supreme Court has repeatedly explained,

"'the fact that the officer does not have the state of mind which is hypothecated by the

reasons which provide the legal justification for the officer's action does not invalidate

the action taken as long as the circumstances, viewed objectively, justify that action.'"

Id., quoting Whren v. United States, supra at 815; see also, United States v. Alcantar,

271 F.3d 731 (8th Cir. 2001)("So long as the officer is doing nothing more than he is

legally permitted and objectively authorized to do, his actual state of mind is

irrelevant."), quoting United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir.

1995).

       b.    Legal Analysis.  Roivanen argues that Harris had no probable

cause to believe that any traffic violations had occurred, and therefore, he challenges

the traffic stop as pretextual.  Contrary to Roivanen's argument, Harris testified that

he stopped Roivanen's car after observing that the driver's view was obstructed by something hanging from the rear view mirror, and that there was no light on the rear license plate. Each of those observations would provide probable cause to believe that a traffic violation had been committed by Roivanen. See, Gerding v. Com'r of Public Safety, 628 N.W.2d 197, 200 (Minn.App. 2001)(Minnesota Statutes Section 169.71, Subdivision 1, prohibits any objects, other than sun visors and rearview mirrors, from being suspended between the driver and the windshield); Minnesota Statutes Section 169.50, Subdivision 2 (requires that cars be equipped so that the rear license plate is illuminated with a white light visible from 50 feet to the rear whenever the headlights or auxiliary driving lights are on). Therefore, even if, as Roivanen claims, Harris' motivation in making the stop stemmed from some "vendetta," the conduct, which Harris claimed as the justification for the stop, plainly constitutes a violation of Minnesota law, and resultantly, we find that the initial stop was justified.

Next, we examine whether Roivanen's Fourth Amendment rights were violated by Harris's request that he step out of his car in order to perform field sobriety tests. In general, "[t]he Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, ask the driver to step out of the vehicle and over to the patrol car, inquire into the driver's

destination and purpose for the trip, and 'undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.'" United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002).  Insofar as the field sobriety tests are concerned, we find that the conduct of those tests, originally by Harris, and subsequently by Kerry, fell well within the proper ambit of a traffic stop, given the observations of Harris.

Harris testified that, although he had observed Roivanen's vehicle pulling away from a known drug house earlier in the evening of October 6, he first suspected that Roivanen was under the influence of intoxicants when Roivanen acted suspiciously by putting his arm, and head, out of the vehicle as Harris approached the driver's side window.  Additionally, Harris testified that, while he did not smell alcohol when he approached the vehicle, Roivanen's eyes were bloodshot, glassy, and watery, and, when Harris turned his flashlight beam into the passenger compartment of the vehicle, Roivanen protested that Harris was unlawfully searching his vehicle.  On cross-examination, Harris admitted that, except for that brief protest, Roivanen was cooperative throughout the traffic stop.  Since Harris concluded that Roivanen's behavior was suspicious, and that he appeared to be under the influence of intoxicants, he made the determination to perform field sobriety tests.

We cannot say, on this Record, that Harris' conclusion was pretextual, or insufficient to warrant further inquiry.   Under Minnesota law, which Harris was enforcing, a field sobriety test may only be administered after the officer observes sufficient indicia of intoxication to form a reasonable suspicion that the driver was operating his vehicle while intoxicated.   See, State Dept. of Public Safety v. Juncewski, 308 N.W.2d 316, 321 (Minn. 1981); see also, State v. Driscoll, 427 N.W.2d 263, 265-66 (Minn. App. 1988).   Indicia of intoxication include bloodshot and watery eyes, an odor of alcohol, slurred speech, and an uncooperative attitude. See, Holtz v. Commissioner of Public Safety, 340 N.W.2d 363, 365 (Minn. 1983); State v. Kier, 678 N.W.2d 672, 678 (Minn. App. 2004).   In this context, under Minnesota law, the statutes relating to charges of driving while intoxicated are to be construed liberally in favor of the public, see, State Dept. of Public Safety v. Juncewski, supra at 319, and the Minnesota Court of Appeals has held that, "[a]n officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence." See, State v. Kier, supra at 678, quoting State v. Carver, 577 N.W.2d 245, 248 (Minn.App. 1998); see also, State v. Schneider, 249 N.W.2d 720, 721 (Minn. 1977); State v. Hicks, 222 N.W.2d 345, 348 (Minn. 1974).

- 41 -

Given Harris' observations, we find no abuse attendant to his conduct of field sobriety tests on Roivanen.  As we have detailed, Roivanen's test results were somewhat mixed, which led Harris to seek a second opinion from another peace officer -- Kerry.  While, on this Record, we would impute no duty upon a Minnesota peace officer to ensure that intoxicated persons do not drive on the public ways, indisputably, it is responsible police work for the officer to be satisfied that such a state of intoxication would not present a personal, or public safety hazard.  Here, after Kerry arrived at the scene, he independently conducted his own sobriety tests, and learned from Roivanen, that Roivanen had smoked marijuana that evening, and continued to feel its effects.  We understand Roivanen to argue that Harris and Kerry failed to provide him with a <u>Miranda</u> warning, and that, therefore, his statements to Kerry are inadmissible.  See, <u>Roivanen's Memorandum in Support, Docket No. 125</u>, at p. 2; see, <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  We disagree.

Given the substantial similarity between the operative facts, here, and those in <u>Berkemer v. McCarty</u>, supra, we find the holding in that case controlling.  There, an officer observed the defendant driver weaving between traffic lanes, and therefore, he conducted a traffic stop.  See, <u>Berkemer v. McCarty</u>, supra at 423.  Upon noticing the defendant having difficulty standing, the officer concluded that the defendant would

be charged with a traffic offense, and his freedom to leave the scene was terminated, although the officer did not tell the defendant that he would be taken into custody.  Id. The officer then conducted a field sobriety test, which is commonly known as a "balancing test," which the defendant failed.  Id.  The officer also asked the defendant, without benefit of a Miranda warning, id. at 424, whether he had been using intoxicants, and the defendant "replied that 'he had consumed two beers and had smoked several joints of marijuana a short time before.'"  Id. at 423.  The officer noticed that the defendant speech was slurred and, having difficulty in understanding the defendant, the officer placed him under arrest.

In resolving the defendant's Motion to Suppress the statements he made at the traffic stop, the Court "acknowledged * * * that a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle," and recognized that, "[u]nder the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to drive away without permission." Id. at 436.  The Court went on to accept that, "[c]ertainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." Id.  Nonetheless, the Court observed that a "traffic stop is presumptively temporary and brief," id. at 437, and "the

- 43 -

circumstances associated with the typical traffic stop are not such that the motorist

feels completely at the mercy of the police." Id. at 438.

After fully considering all of the attendant factors, the Court held, in pertinent

part, as follows:

> Typically, this means that the officer may ask the detainee
> a moderate number of questions to determine his identity
> and to try to obtain information confirming or dispelling the
> officer's suspicions.   But the detainee is not obliged to
> respond.  And, unless the detainee's answers provide the
> officer with probable cause to arrest him, he must then be
> released.  The comparatively nonthreatening character of
> detentions of this sort explains the absence of any
> suggestion in our opinions that Terry stops are subject to
> the dictates of Miranda.  The similarly noncoercive aspect
> of ordinary traffic stops prompts us to hold that persons
> temporarily detained pursuant to such stops are not 'in
> custody' for the purposes of Miranda.

Id. at 439-40.

Here, Harris did not handcuff Roivanen, until Roivanen was formally placed under

arrest, and there is no showing, in this Record, that Roivanen was forced to remain at

any one particular spot at the scene, at least until the arrest was effected.  While Harris

did place Roivanen in the back seat of his squad for a period of time, he testified that

he would not have objected if Roivanen wanted to wait in some other location, and

that testimony has not been controverted.  There is no evidence that Harris, or Kerry,

- 44 -

employed any coercion, or threats, nor is there any showing that, during the initial traffic stop, through the completion of Kerry's testing, that the scene was police-dominated, or that Roivanen was "strong-armed."  Accordingly, we conclude that <u>Berkemer</u> controls our analysis, and the result we reach, and therefore, we find no violation of the Fourth and Fifth Amendments, which arises out of Roivanen's traffic stop -- that is, absent a showing that the stop was not unreasonably lengthy.

Even though Roivanen makes no express argument, that the traffic stop extended so long as to constitute a violation of his rights under the Fourth Amendment, we examine that question briefly.  Understandably, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  <u>United States v. Sanchez</u>, 417 F.3d 971, 975 (8th Cir. 2005), quoting <u>United States v. Bloomfield</u>, supra at 916; <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983).  "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  <u>Id.</u>; see also, <u>United States v. Willis</u>, 967 F.2d 1220, 1224 (8th Cir. 1992).  Accordingly, "[a] 'de facto arrest occurs when the officer's conduct is more intrusive than necessary for an investigative stop.'"  <u>United States v. Hill</u>, 91 F.3d 1064, 1070 (8th Cir. 1996), quoting <u>United States v. Bloomfield</u>, supra at 917;

see, <u>United States v. Navarete-Barron</u>, 192 F.3d 786, 791 (8th Cir. 1999)("A Terry stop

may turn into an arrest if the stop lasts for an unreasonably long time or if officers use

unreasonable force.").

 In determining whether a police encounter with a citizen is a <u>de facto</u> arrest, our

Court of Appeals has instructed as follows:

> Time is an important factor in distinguishing between an
> investigative stop and a <u>de facto</u> arrest: There is "no rigid
> timeline on Terry stops," United States v. Sharpe, 470 U.S.
> 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), but
> a stop may be too long if it involves "delay unnecessary to
> the legitimate investigation of the law enforcement officers,
> id. at 687, 105 S.Ct. at 1576.  Another factor is "the degree
> of fear and humiliation that the police conduct engenders."
> United States v. Lego, 855 F.2d 542, 544-45 (8th Cir.
> 1988)(citation omitted).  The courts have also held that
> transporting a suspect to another location or isolating him
> from others can create an arrest.  See, [United States v.]
> Rose, 731 F.2d [1337, 1342 (8th Cir. 1984), cert. denied 469
> U.S. 931 (1984)].  Additional factors that may weigh in
> favor of an arrest are subjecting a suspect to unnecessary
> delays, handcuffing him, or confining him to a police car.

<u>United States v. Bloomfield</u>, supra at 917; see, <u>United States v. Ruiz</u>, 412 F.3d 871,
879 (8th Cir. 2005); <u>United States v. Dixon</u>, 51 F.3d 1376, 1380 (8th Cir. 1995); <u>United
States v. Hawkins</u>, 59 F.3d 723, 727 (8th Cir. 1995), cert. granted, and judgment
vacated on other grounds, 516 U.S. 1168 (1996).

Notwithstanding that the traffic stop extended forty-five (45) minutes, between its inception and the time of Roivanen's arrest, we conclude that there was no de facto arrest here, and that the length of time was reasonable under the circumstances.

The majority of the stop appears to have been expended in assessing whether Roivanen was intoxicated, and required the conduct of a battery of sobriety tests, by two different law enforcement officers. As best as we can tell, on the basis of the evidence presented, the officers acted diligently, and the only perceivable delay was occasioned by the need to await Kerry's arrival at the scene, which took approximately ten (10) minutes. Roivanen does not expressly complain of any unreasonably intrusive means of investigation or detention, nor do we find a basis upon which he could do so. Under the circumstances presented, we find that the forty-five (45) minute delay to be reasonable. See, e.g., United States v. Sanchez, 417 F.3d 971, 975 (8th Cir. 2005)("A total duration of approximately forty-five minutes is certainly not unreasonable given these circumstances, and these officers employed the least intrusive means of detention and investigation."), citing United States v. Maltais, 403 F.3d 550, 557 (8th Cir. 2005) as "finding a detention of nearly three hours reasonable under the circumstances," and United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994)[en banc], as "holding a one-hour detention reasonable.

In sum, we find no Fourth or Fifth Amendment violations, which arise from Roivanen's traffic stop, or the search of his vehicle, which ensued after his arrest was lawful, either as an incident of his arrest,[12] as supported by probable cause arising from Rico's alert at the outer door of the vehicle,[13] or as an appropriate inventory

---

[12]As the Court reiterated, in United States v. Ball, --- F.3d ---, 2007 WL 2376769 at *4 (8th Cir., August 22, 2007), quoting United States v. Hrasky, 453 F.3d 1099, 1100 (2006), cert. denied, --- U.S. ---, 127 S.Ct. 2098 (2007), "'when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.'" Earlier, in United States v. Hrasky, supra at 1102-03, the Court concluded that "a contemporaneous incident of that arrest" would include a wait of approximately one hour after the arrest. Here, the search ensued immediately after Harris' arrest of Roivanen, and the contraband, that Roivanen seeks to suppress, was in the passenger compartment of Roivanen's vehicle. Similarly, the search of Roivanen's person was equally a lawful incident of his arrest.

[13]"[A] canine sniff of the exterior of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure' that it does not constitute a 'search' within the meaning of the Fourth Amendment." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999), cert. denied sub nom. Alexander v. United States, 528 U.S. 1161 (2000); see also, United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004)("Our court has held that a canine sniff of the exterior of a vehicle does not constitute a search subject to the Fourth Amendment's strictures."), citing United States v. $404,905.00 in U.S. Currency, supra at 647. Once the canine alerts on the exterior of a vehicle, the officers have "probable cause to search" that vehicle. Id. at 647, citing United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 1994)[en banc], cert. denied, 514 U.S. 1113 (1995). Here, we find that the testimony of Officer is credible in accrediting Rico's ability to accurately alert to the presence of illicit drugs.

- 48 -

search that was antecedent to the vehicle's impoundment.[14]   Accordingly, we find no

legitimate basis upon which to grant Roivanen's Motion to Suppress, and we

recommend that the same be denied.

B.   The Motions of the Defendants Carlson, Hasty, and Roivanen to Suppress
Statements.

---

[14]As our Court of Appeals has recently explained:

> Law enforcement may search a lawfully impounded vehicle
> to inventory its contents without obtaining a warrant.  See
> South Dakota v. Opperman, 428 U.S. 364, 376, 96 S.Ct.
> 3092, 49 L.Ed.2d 1000 (1976); United States v. Pappas,
> 452 F.3d 767, 771 (8th Cir. 2006)("An inventory search by
> police prior to the impoundment of a vehicle is generally a
> constitutionally reasonable search.").  The reasonableness
> of an inventory search is determined based upon the totality
> of the circumstances.  Untied States v. Beal, 430 F.3d 950,
> 954 (8th Cir. 2005).  Those circumstances include whether
> the search was conducted according to standardized
> procedures.  Opperman, 428 U.S. at 376, 96 S.Ct. 3092.

United States v. Kimhong Thi Le, 474 F.3d 511, 515 (8th Cir. 2007), cert. denied, ---
U.S. ---, 127 S.Ct. 2891 (2007).

Here, Officer testified that the St. Louis County Sheriff's Department has a standard
inventory search policy that requires the conduct of an inventory search prior to
vehicle towing, after a traffic stop.  As related by Officer, the inventory search is
designed to protect the County, and the Deputies, from claims of lost or damaged
property.  Accordingly, we conclude that the conduct of an inventory search, on
Roivanen's car, was not a ruse, but was an legitimate policy which passes
constitutional muster.  In addition, there is no evidence that the inventory search was
contrary to State law, or proper police procedure.

As to the Motions to Suppress of Hasty, and Roivanen, there is no dispute, between the parties, which requires our resolution. The Government advises that no statements were taken from Hasty, see, <u>Government's Omnibus Answer</u>, <u>Docket No. 85</u>, at p. 2, and, as such, we recommend that Hasty's Motion be denied, as moot. While statements were taken from Roivanen, at the time of traffic stops of October 6, 2006, and April 28, 2007, the Government has advised, at the Motions Hearing, that those statements will not be offered in its case-in-chief at Trial. See, <u>Roivanen's Memorandum in Support</u>, <u>Docket No. 125</u>, at p. 1. Consequently, we recommend that Roivanen's Motion to Suppress Statements should also be denied, as moot.

As to Carlson, he seeks to suppress the statements that were taken during the meeting, with law enforcement, on February 14, 2007, and argues that those statements were coerced, in violation of his Fifth Amendment privilege against self-incrimination. We proceed to that claim.

1.     <u>Standard of Review</u>. Government agents are not required to administer Miranda warnings to everyone they question. See, <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977). Rather, <u>Miranda</u> warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994),

quoting Miranda v. Arizona, supra at 444; Berkemer v. McCarty, supra at 428-29;

United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985).

"In determining whether an individual was in custody, a court must examine all

of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply

whether there [was] a formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest." Stansbury v. California, supra at 322, quoting

California v. Beheler, 463 U.S. 1121, 1125 (1983). A list of common indicia of

custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of
> questioning that the questioning was voluntary, that the
> suspect was free to leave or request the officers to do so, or
> that the suspect was not considered under arrest; (2)
> whether the suspect possessed unrestrained freedom of
> movement during questioning; (3) whether the suspect
> initiated contact with authorities or voluntarily acquiesced
> to official requests to respond to questions; (4) whether
> strong arm tactics or deceptive stratagems were employed
> during questioning; (5) whether the atmosphere of the
> questioning was police dominated; or (6) whether the
> suspect was placed under arrest at the termination of the
> questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir 1990); see United States v.
Czichray, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005);
United States v. Axsom, 289 F.3d 496, 500, 501 (8th Cir. 2002).

However, these factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827. Instead, the Griffin factors serve as a guide in the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest." See, United States v. Czichray, supra at 827.

Whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination. See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000). For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.] See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961)("[A]ll the circumstances

> attendant upon the confession must be taken into account");
> Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all
> the attendant circumstances indicate that the confession was
> coerced or compelled, it may not be used to convict a
> defendant").   The determination "depend[s] upon a
> weighing of the circumstances of pressure against the
> power of resistance of the person confessing." Stein v. New
> York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and

foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507

U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly,

479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee,

322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367

U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v.

Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693

(listing the applicable considerations).

    2.   Legal Analysis.  Carlson challenges the admissibility of the statements

he made during his meeting with Flanagan, and the two (2) Agents from the DEA, on

February 14, 2007.  The Record is devoid of any evidence that Carlson was advised

of his Miranda rights, at any time prior to, or during, that meeting, and therefore, we

assume that no such warning was given.  In addition, we accept, absent any evidence

to the contrary, that Carlson's statements were made in response to direct questioning from the Agents.   Accordingly, the pertinent inquiry is whether Carlson was in custody, so as to require a <u>Miranda</u> advisory and, if not, whether his statements were otherwise involuntary.

The meeting between Carlson, and Flanagan and the Agents, was conducted in a public restaurant, and was arranged with Carlson's consent.  There is no suggestion that Carlson's freedom of movement was restrained in any way.  Indeed, Flanagan testified that the officers deliberately arranged for Carlson to be seated on the outside of the booth, so that he would be free to leave without disturbing anyone at the table, and Carlson acknowledged, at the Hearing, that, after he concluded the meeting, he paid his bill and left the restaurant of his own accord.  Carlson also conceded that he was aware that he was not under arrest through the course of the meeting, and had no apprehension that he would be arrested at the conclusion of the session.

Moreover, there is nothing to suggest that the officers employed any deceptive stratagems, or strong arm tactics, or even raised their voices, at any time during the meeting.  The meeting was conducted in less than an hour, and ended amicably.  Further, Carlson was not arrested until approximately two (2) months after the conclusion of that meeting.  Accordingly, after applying the <u>Griffin</u> factors, we find

that Carlson was not in custody, during the meeting with law enforcement, on February 14, 2007.  See, United States v. Martin, 369 F.3d 1046, 1057 (8th Cir. 2004), cert. denied sub nom. Biernat v. United States, 543 U.S. 1035 (2004)(finding that interview was not custodial when it took place at a public restaurant, and the defendant's freedom was "unrestrained beyond the ordinary confines of being seated at a table in a public cafeteria.").

Even in the absence of a custodial interrogation, we must also determine, consistent with the requisites of the Fifth Amendment, whether the statements given by Carlson were voluntary, or whether -- as Carlson alleges -- they were the product of an overborne will.  Notably, Carlson fails to sustain any assertion that his statements were involuntary, with any specific, and evidence-based, instances of coercion.  As we have detailed, Carlson's meeting was the product of his election to cooperate with law enforcement.  He does not contend that the length of the meeting was unduly burdensome, that he was denied any of the normal accommodations of daily living, or that the officers duped him into lending his cooperation in their investigation.

Moreover, he does not suggest, let alone support, the existence of any physical, or mental impairments, which would impact upon the voluntariness analysis, nor urge

any age-related naivety, which would reflect a less than voluntary choice, on his part, to answer law enforcement's questions.  In support of his claim, that he was coerced by the officers into making self-incriminating statements at the time of the Hearing, Carlson has argued that he only spoke with the officers because they had threatened to serve him with a Subpoena at his place of work, and that, while he felt free to leave the meeting at any time, he knew that, if he left, he would be subpoenaed to testify against his friends before a Grand Jury.

However, Carlson acknowledged that he met with his attorney, prior to the meeting on February 14, 2007, and, after that consultation, he decided that he would attend the meeting.  Moreover, he acknowledged that his only fear was that he would be served with a Subpoena at work, but he did not express any anxiety that he would lose his position, or would otherwise be compromised, by the service of a Subpoena. As a matter of pure reality, Grand Jury Subpoenas are served on any number of witnesses who are guilty of no offense, but who simply have information that is relevant to the Grand Jury's investigation.  We find it hard to comprehend how the service of a Grand Jury Subpoena, even at work, could threaten an employee's livelihood, by the mere fact of the service, itself.

Essentially, Carlson claims that he was coerced by the Agents into meeting with them, by being threatened with potential humiliation at his workplace, and we conclude that, even if the claim were plausible, which we have no cogent reason to believe, it would not constitute a factor sufficient to overcome Carlson's will.  Under the law of this Circuit, "[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will * * *."  Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001), citing United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978); see also, United States v. Gallardo-Marquez, 253 F.3d 1121, 1123 (8th Cir. 2001)(upholding statements as voluntary when police officers told the defendant that he would receive a life sentence when the actual penalty was twenty-three (23) years).  Even if, as Carlson asserts, the investigating officers threatened him with the service of a Subpoena during the course of the meeting, when they allegedly placed the Subpoena on the table as they spoke, such a display would not, as a matter of law, rise to the level of a threat that would result in a finding that Carlson's will was overborne.

Accordingly, viewing the evidence in totality, we find that Carlson's will was not over-borne, and we conclude that the statements which Carlson made during the

meeting on February 14, 2007, were voluntary, and therefore, his Motion to Suppress those statements should be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.      That the Motions of the Defendant Rekonen for Suppression of Evidence Obtained Through Illegal Search [Docket No. 55] and to Suppress Search and Seizure Evidence [Docket No. 57] be denied.

2.      That the Motion of the Defendant Hasty to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 79] be denied.

3.      That the Motion of the Defendant Hasty to Suppress Statements, Admissions and Answers [Docket No. 82] be denied.

4.      That the Motion of the Defendant Carlson to Suppress Statement [Docket No. 68] be denied.

5.      That the Motion of the Defendant Roivanen to Suppress Confessions or Statements in the Nature of Confessions [Docket No. 117] be denied.

6.      That the Motion of the Defendant Roivanen to Suppress Evidence from Searches and Seizures [Docket No. 118] be denied.

Dated:  August 31, 2007

s/Raymond L. Erickson
Raymond L. Erickson
CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than September 17, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than September 17, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.

- 59 -